**APEX OIL COMPANY,**
**Plaintiff-Appellee,**

v.

**VANGUARD OIL & SERVICE CO.**
**INC., Defendant-Appellant.**

**No. 436, Docket 84–7532.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 5, 1984.

Decided April 18, 1985.

Oakes, Circuit Judge, filed concurring opinion.

Steven E. Levitsky, New York City (Charles E. Simpson, Lihn Menaker & Simpson, New York City, on brief), for defendant-appellant.

Donald F. Mooney, New York City (Thomas M. Eagan, New York City, on brief), for plaintiff-appellee.

Before FEINBERG, Chief Judge, and OAKES and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This diversity case involves an alleged oral contract for the sale of $8.8 million of fuel oil. Following a bench trial, the District Court for the Southern District of New York (John F. Keenan, Judge) found that plaintiff-appellee Apex Oil Company ("Apex") and defendant-appellant Vanguard Oil & Service Company, Inc. ("Vanguard") had entered into such a contract, under which Vanguard was to sell and Apex to buy. Finding that Vanguard's failure to deliver the oil to Apex constituted a breach of the contract, the District Court awarded Apex damages of $1,049,-983.00, plus prejudgment interest.

On appeal, Vanguard primarily attacks the District Court's findings of fact. Conceding that the "clearly erroneous" standard governs our review of those findings, Vanguard nonetheless urges us to hold that the parties' agreement, if any, placed Vanguard under only a conditional obligation to deliver oil to Apex. Vanguard also argues that, if a contract of sale did exist, it is unenforceable under the statute of frauds. Our review of this record does not persuade us to reject the District Court's determination that these parties entered into an unconditional contract of sale and

that the record contains a document satisfying the statute of frauds.

## BACKGROUND

Vanguard and Apex are engaged in the business of buying and selling petroleum products. Prior to the course of dealing surrounding the disputed contract, which the District Court found was formed on April 7, 1982, the parties had successfully negotiated and fully performed one other agreement for the sale of oil. The prior contract was formed on December 29, 1981, when Arthur Walston, a Vanguard trader, and Edwin Wahl, an Apex trader, had a telephone conversation in which they agreed that Vanguard would sell and Apex would buy approximately 200,000 barrels of fuel oil.[1]

The December 29 agreement was documented in the following way. On December 30, 1981, Vanguard sent a telex to Apex to which Apex responded by telex. Both telexes expressly "confirm[ed] our telephonic agreement of 12/29/81," under which "Vanguard will sell" and "Apex will purchase" approximately 200,000 barrels of oil. Both telexes also listed key terms of the agreement, including arrival date of the oil, its price, and payment terms requiring Apex to wire transfer funds on receipt of Vanguard's invoice and a report from a named inspector. In addition to the telex, Apex signed and sent to Vanguard a "Product Purchase Agreement," which confirmed the parties' "understanding" and listed some terms of the agreement, including a term designating New York Harbor as place of delivery, not contained in either telex. Wahl, the Apex trader, sent the Product Purchase Agreement to Vanguard as part of Apex's "normal procedure" when dealing with another company for the first time. Though the Product Purchase Agreement expressly requested that a copy of the agreement be returned to Apex and contained a line for Vanguard's signature, Vanguard did not sign or return a copy of the agreement to Apex.

The December 29, 1981, contract was fully performed in late January 1982 when Vanguard delivered the oil to Apex in New York Harbor. Vanguard's president sent invoices and the inspector's report to Apex and instructed Apex to wire transfer payment to Chase Manhattan Bank ("Chase"). Apex complied with these instructions. Following the January 1982 delivery, Vanguard contacted Apex on another occasion to solicit the sale to Apex of petroleum products. Apparently, Apex expressed no interest in making further purchases from Vanguard until Walston, the Vanguard trader, called Wahl, the Apex trader, on April 7, 1982.

In that call, the District Court found, Walston and Wahl entered into a binding contract of sale on behalf of Vanguard and Apex respectively. The following circumstances led up to the April 7 telephone call. On April 6, Common Energy International ("CEI") offered to sell to Vanguard 357,000 barrels of fuel oil meeting certain specifications at 80.50 cents per gallon. Vanguard accepted this offer and then prepared to arrange financing for the CEI deal. In order to obtain a letter of credit from Chase, Vanguard had to demonstrate that it had a contract to resell the oil it was buying from CEI. Since Vanguard planned to use 100,000 barrels of the CEI shipment to satisfy a preexisting obligation to sell oil to Conrail, there were 257,000 barrels from the CEI shipment that Vanguard had to sell before Chase would arrange a letter of credit. These 257,000 barrels of oil were the topic of the April 7 telephone conversation between Walston of Vanguard and Wahl of Apex.

The District Court credited Wahl's testimony concerning the April 7 conversation. Wahl stated that Walston called him, informed him that Vanguard had a cargo of oil scheduled to arrive in New York Harbor by April 24, and offered to sell to Apex 257,000 barrels from that shipment at 84 cents per gallon. Wahl testified that he offered to pay 82 cents per gallon and that Walston eventually agreed to a price of

1. The District Court found that there are 42 gallons of oil in a barrel.

82.254 cents per gallon. According to Wahl, Walston then stated, "[W]e have a done deal. We are done." Wahl asked Walston if Vanguard needed "anything for [its] books." Walston responded by requesting Wahl to send him a telex for Vanguard's "in-house purposes." [2]

On April 7, 1982, Wahl sent the following telex addressed to Walston at Vanguard:

THIS IS TO CONFIRM APEX WILL PURCHASE 257,000 BBLS. OF NO. 2 FUEL OIL 77 GRADE, (OTHERWISE MEETING N.Y. HARBOR) BY APRIL 24, 1982 @ 82.254 PER GALLON.
REGARDS,
ED WAHL
APEX OIL CO.

Vanguard received the telex but never objected to its contents or responded to it in any way.

A day or two after the conversation between Walston and Wahl, Vanguard submitted to Chase an application for a $12 million letter of credit to be opened for the account of Vanguard in favor of CEI. Accompanying the application were certain documents, including a letter from Vanguard to Chase stating "we are selling" 100,000 barrels to Conrail and 257,000 barrels to Apex, three telexes between Vanguard and CEI, the April 7 telex from Apex to Vanguard, and a letter from Conrail to Vanguard. In accordance with Chase's requirement that approval of the letter of credit was subject to Vanguard's assignment to Chase of its accounts receivable from Conrail and Apex, a Chase official sent a letter to Vanguard requiring Vanguard to "execute and return" a Uniform Commercial Code ("UCC") filing in order to accomplish such assignment. Vanguard's president testified that Vanguard assigned to Chase "the Conrail and tentative Apex receivables."

Throughout the latter part of April, the parties were in almost daily contact. An Apex scheduler testified that, starting in the middle of April, he called Vanguard on many occasions endeavoring to arrange for delivery of the 257,000 barrels of oil. The scheduler acknowledged that Apex never made final arrangements to receive the oil at a particular terminal or located a customer willing to buy the oil. Though he stated that Apex's supply sheets contained no entry concerning Vanguard's obligation to deliver oil, he claimed that his own supply notes did reflect such obligation. However, the scheduler further testified that he destroyed these notes on May 13, 1982.

On April 23, Walston informed the Apex scheduler that the oil would be arriving on a tanker within five or six days. After receiving this information from the scheduler, Wahl called Walston to discuss delivery of the oil. In that conversation, Walston explained that Vanguard was having problems with its supplier and requested extension of the delivery date. Walston did not indicate that Vanguard was under only a conditional obligation to sell to Apex, but rather assured Wahl that the oil would be delivered. Wahl agreed to give Vanguard more time to deliver.

When Vanguard failed to deliver the oil on May 7, Wahl called Walston to question him about such failure. Walston explained that Vanguard needed still more time to make the delivery, but Wahl advised him that Apex required the oil immediately and insisted that Vanguard should obtain it in the spot market. At this time Walston did not say anything to indicate that Vanguard's obligation to deliver was conditional. Following further discussion, Wahl agreed to allow Vanguard an additional six days, to May 13, 1982, to deliver the oil. The oil was not delivered on May 13. Wahl

2. Though the District Court explicitly found that Walston's trial testimony was "not worthy of belief," Vanguard relies on that testimony to support its contention that the parties' agreement was conditional. Walston testified that he informed Wahl that Vanguard had a contract to sell oil to Conrail and that, after fulfilling its obligations under that contract, Vanguard might

have some oil left over. Walston further testified that, after he negotiated price with Wahl, he asked Wahl to send him a telex confirming Apex's willingness to purchase. Walston claimed that he told Wahl that he needed the telex in order to apply for financing "so that I can try to get the oil. If I get the oil, Conrail will get theirs and you will have yours."

reported Vanguard's failure to deliver to an Apex attorney, who sent Vanguard a telex dated May 18, 1982, notifying Vanguard of its responsibility for damages for breach of contract. According to Wahl, Apex received no response to this telex until August 1982. At that time, Walston called Wahl to solicit a sale of fuel oil by Vanguard to Apex. Referring to the parties' "problem" with the April 7 "contract," Wahl refused the offer. Walston acknowledged the "problem" and suggested that, as a remedy, Vanguard might be willing to offer Apex a reduced price on this shipment. Wahl persisted in his refusal to enter into this transaction.

Both parties called expert witnesses who described industry practice. Apex's expert testified that the vast majority of petroleum contracts are entered into over the telephone and confirmed by telex. Though he testified that it was important to create memoranda accurately reflecting the parties' oral agreement, he stated that traders might not consider documentation to be "crucial" when dealing with a company they knew from experience to be reliable. Vanguard's expert witness agreed that it was customary in the oil industry for parties to negotiate binding contracts over the telephone and that most oil contracts were so negotiated. He testified that the practice followed by the parties with respect to the December 29, 1981, contract was regular industry practice, that is, one party sends a telex confirming the terms of the contract and the recipient responds in a telex that confirms or corrects the terms of the confirming telex. Vanguard's expert further testified that, if the party sending the confirming telex received no response, that party was entitled to assume that the transaction as presented in the confirming telex was acceptable to the other party. However, he also stated that it was customary for the sender of the confirming telex to insist on a responsive telex.

## DISCUSSION

Attempting to persuade us to reject the District Court's findings, Vanguard initially points out what it considers a procedural irregularity, namely, that the District Court adopted the wording of most of Apex's proposed findings of fact. Though Vanguard does not urge us to reverse the District Court's decision on this basis alone, it contends that the District Court failed to exercise independent judgment and that we therefore should view its findings with skepticism.

Rule 52(a) of the Federal Rules of Civil Procedure, which requires a district court sitting without a jury to "find the facts specially," not only serves to aid the reviewing court but also to assure that the district judge will exercise due care in ascertaining the facts based upon his own review of the evidence. *United States v. Forness*, 125 F.2d 928, 942–43 (2d Cir.), *cert. denied*, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942). Because findings of fact are of "grave importance" to the appropriate resolution of a legal dispute, we have cautioned district judges to avoid "mechanically" adopting the findings proposed by the victorious party. *Id.* at 942; *see International Controls Corp. v. Vesco*, 490 F.2d 1334, 1341 n. 6 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). However, we have also held that district judges may choose to "adopt findings offered by a party to an action" and that such choice does not necessarily mean that the district judge failed carefully to review the evidence in the case. *Citizens for Balanced Environment and Transportation, Inc. v. Volpe*, 650 F.2d 455, 462–63 (2d Cir.1981).

We see no reason to condemn the procedure followed by the District Court in this case. The District Court did not follow the questionable procedure of ruling from the bench in Apex's favor, directing Apex to submit findings, and then signing those findings without further consideration. *See Anderson v. Bessemer City*, —— U.S. ——, ——, 105 S.Ct. 1504, 1510–11, 84 L.Ed. 2d 518 (1985); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656–57 & n. 4, 84 S.Ct. 1044, 1047 & n. 4, 12 L.Ed.2d 12 (1964). Nor did the District Court adopt

*"in toto"* proposed findings, a practice we have expressly disapproved. *See International Controls Corp. v. Vesco, supra,* 490 F.2d at 1341 n. 6. Rather, the District Court made numerous minor changes in the proposed findings, such as deleting argumentative language, and several significant changes, such as inserting findings concerning evidence that supported Vanguard's position at trial. Under these circumstances, it is clear that the District Judge's findings were "the product of the workings of [his] mind," *United States v. El Paso Natural Gas Co., supra,* 376 U.S. at 656, 84 S.Ct. at 1047, and as such will not be set aside on appeal unless Vanguard "overcomes the heavy burden of showing" that the findings are clearly erroneous, *United States v. Forness, supra,* 125 F.2d at 942; *see Anderson v. Bessemer City, supra,* —— U.S. at ——, 105 S.Ct. at 1511.

■ The record supplies no basis for us to reject the findings. Indeed, a critical finding in this case, the contents of the April 7 telephone call, depended on the Court's assessment of the credibility of the witnesses, which assessment is entitled to "great deference" on appeal, *see Sweeney v. Research Foundation of State University of New York,* 711 F.2d 1179, 1185 (2d Cir.1983). We note that the District Court's determination that Vanguard's witnesses were unworthy of belief was based not only on its subjective evaluation of their demeanor but also on objective factors, such as an admission by Vanguard's president that he gave false information in sworn answers to Apex's interrogatories. Apex was, as Vanguard points out, far less careful in preparing and preserving its paper work relating to the April 7, 1982, contract than it was in documenting the December 29, 1981, contract. However, particularly in light of other evidence in the record showing that oil companies routinely negotiate binding contracts over the telephone and that they do not always reduce these agreements to formal, written contracts, the fact that Apex was careless on this occasion certainly did not require the District Court to discredit the Apex witnesses' version of the telephone call.[3]

■ Though Judge Keenan's decision to believe the Apex trader's account of the April 7 phone call was critical to his resolution of this dispute, the District Court's ultimate conclusion that the parties entered into a contract did not depend solely on that phone call. As the District Court correctly observed, the existence of a contract may be established through conduct of the parties recognizing the contract. *See P.J. Carlin Construction Co. v. Whiffen Electric Co.,* 66 A.D.2d 684, 411 N.Y.S.2d 27 (1978); *see also* N.Y.U.C.C. § 2–204(1) (McKinney 1964). Evidence of Vanguard's conduct following April 7 significantly supports the finding that a contract was made. In applying for a letter of credit, Vanguard included the April 7 telex from Apex in the package of documents sent to Chase to satisfy the Bank's requirement that Vanguard have a binding contract to resell oil from the CEI shipment. Vanguard cannot treat the Apex telex as a binding contract when Vanguard seeks credit and then claim to have no contract when Apex seeks oil. Vanguard's assignment to Chase of the Apex account receivable also supports the conclusion that a contract was formed, as does Vanguard's conduct in requesting Apex to agree to extend the delivery date, without expressing the view that its obligation to sell was conditional.

■ Vanguard next argues that, even if the parties made a firm contract, the contract is unenforceable under the statute of frauds.[4] Section 2–201(1) of the UCC

---

**3.** The testimony of Steven Wirkus, an Apex scheduler, corroborated Wahl's version of the April 7 phone conversation. Wirkus testified that he entered Wahl's office in the middle of the conversation and listened on the speakerphone to the traders discussing their "done deal."

**4.** Though Vanguard raised the statute of frauds defense for the first time in its post-trial brief, the District Court did not rule that the defense was thereby waived, as Apex suggests on appeal, but rather rejected the defense on the merits. We need not consider the waiver argument because we agree with the District Court that the

provides that a contract for the sale of goods for $500 or more is not enforceable unless there is some writing indicating that the parties have entered into a contract that is signed by the party against whom enforcement of the contract is sought. N.Y.U.C.C. § 2–201(1) (McKinney 1964). In this case, Vanguard contends that there is no writing satisfying this requirement. However, section 2–201(2) provides a "merchant's exception," which the District Court found excused the requirement that Apex offer a writing signed by Vanguard. Under section 2–201(2), a contract between merchants is enforceable "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents ... unless written notice of objection to its contents is given within ten days after it is received." *Id.* § 2–201(2). We agree with the District Court that the April 7 telex, signed by Wahl, confirming Apex's obligation to purchase and stating quantity, price, and delivery terms, satisfied section 2–201(2). It is true that the telex did not in terms state that Vanguard was under an unconditional obligation to sell. However, section 2–201 does not require parties precisely to set forth every material term of their agreement. Rather, " '[a]ll that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction.' " *Iandoli v. Asiatic Petroleum Corp.*, 57 A.D.2d 815, 816, 395 N.Y.S.2d 15, 16 (quoting Official Comment, N.Y.U.C.C. § 2–201 (McKinney 1964)), *appeal dismissed*, 42 N.Y.2d 1011, 398 N.Y.S.2d 535, 368 N.E.2d 285 (1977). The telex established that the parties had entered into a contract and provided a basis for the District Court to accept the testimony of Apex's witnesses concerning the nature of that contract.

In upholding the District Court's conclusion that the parties made a binding contract and that the April 7 telex satisfied the "merchant's exception" to the statute of frauds, we recognize that we are permitting a substantial transaction to be consummated on fragmentary conversation and documentation. However, it is the practice in many fields to transact business quickly and with a minimum of documentation, and the expert testimony indicates that purchasing oil at wholesale is one such field. Parties doing business with each other in such circumstances take the risk that their conflicting versions of conversations will be resolved to their disfavor by a fact-finder whose findings, even if incorrect, are immune from appellate revision. The UCC supplies what legislatures have deemed to be adequate protection by requiring a document satisfying the "merchant's exception." Parties seeking the opportunity to make money with hurriedly arranged and briefly documented transactions ought not to expect appellate courts to provide them with extra protection against the risk that on occasion they will be held to the terms of an agreement that not every fact-finder would have found had been made. Once satisfied that Judge Keenan was entitled to make the findings he did, which we do not question, and that the UCC provisions were met, our reviewing function is at an end.

■ Finally, Vanguard challenges the District Court's computation of damages. The District Court awarded Apex damages representing the difference between the market price of the oil, which it determined to be 92 cents per gallon, and the contract price, 82.254 cents per gallon, less certain fees Apex would have incurred but for the breach, for a total award of $1,049,983.00, plus prejudgment interest. We reject Vanguard's attacks on the District Court's findings of fact with respect to specifications and market price of the oil. The record supports the District Court's findings concerning the grade of the fuel oil that was the subject matter of the parties' agreement; we note that, in discrediting testimony of Vanguard's witnesses regarding specifications of the oil, the District Court relied on the specifications contained in Vanguard's application for a letter of

---

statute of frauds does not bar enforcement of this contract.

credit. Similarly, we conclude that, though the record reflects that the parties vigorously contested market price, the record supports the District Court's determination of market price; in this connection, the District Court relied in part on a market newsletter, which Vanguard stipulated reflected the market price of the fuel oil that was the subject of the contract.

 Vanguard's arguments concerning the damage formula employed by the District Court, which is contained in N.Y.U. C.C. § 2–713 (McKinney 1964), suggest that the formula should not be used in computing damages awarded to a plaintiff-buyer who, like Apex, is not the end user of the product. The formula makes sense when an end user sues the breaching seller because, even if the end user elects not to go into the market and cover, thus demonstrating its out-of-pocket loss, it still has lost the value of having the product. However, in this case, Apex was not an end user, but rather a broker who planned to resell the product to another customer. In the absence of proof that Apex had a customer willing to purchase the oil, it seems fictional to hold that Apex has "lost" the difference between the market price and contract price. However, Vanguard's arguments fail to consider the UCC formula from the perspective of the breaching seller, who always has the option of going into the market and buying product to satisfy its obligation to the buyer. Since Vanguard elected not to cover and thus fix its loss, it saved an amount equal to the difference between the market price and the contract price. The UCC formula reflects a policy judgment that it makes more sense to award the amount of that saving to the buyer than to permit the non-performing and non-covering seller to retain it. Whether that policy decision should be legislatively limited to buyers who demonstrate some prospect of forgone opportunity for profitable resale is not for us to say.

Apex's application for damages and costs to sanction Vanguard for taking a frivolous appeal is denied. Though the clearly erroneous standard should make a litigant pause before filing an appeal primarily challenging findings of fact, the questions presented on this record are not frivolous.

The judgment of the District Court is affirmed.

OAKES, Circuit Judge (concurring):

I concur although I think the case a closer one than the majority opinion suggests. I have in mind the Supreme Court's recent reminder in *Anderson v. City of Bessemer City*, —— U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), that (1) adoption by the trial judge of findings proffered by a party, while not looked upon with enthusiasm, does not make permissible a standard of review different from the "clearly erroneous" standard set forth in Fed.R.Civ.P. 52(a), *id.* at ——, 105 S.Ct. at 1509, and (2) appellate courts must not exercise de novo review over findings not based on credibility determinations but based instead on documents or objective evidence, contrary to the former Second Circuit rule, *id.* at ——, 105 S.Ct. at 1511. We are nevertheless entitled to declare the facts to be contrary to the findings of a trial court in an appropriate case, given documentary or objective evidence that so contradicts a witness's story, or a story itself so internally inconsistent or implausible on its face, that no factfinder can reasonably credit it. *Id.* This case, in my view, just fails to meet that test.

Going with Vanguard, after all, are the following:

1. The confirming telex in the parties' first deal confirmed that "Vanguard will sell" and "Apex will purchase," while the critical telex in this, the second, deal said only that "Apex will purchase";

2. While Apex traders ordinarily propose "deal notes" to record consummated deals, there was none either for this deal (other than a copy of the confirming telex) or the subsequent "extensions" of the date for delivery;

3. Apex did not send a printed standard-form contract as it had done in connection with the first deal;

4. Apex did not, contrary to trade custom, ask for a response from or reconfirmation by Vanguard; and

5. There was independent expert testimony that Apex's telex was merely a "ready, willing and able" offer to purchase, used to help a seller obtain bank financing.

At the same time, Vanguard undoubtedly received the April 7 telex, but stood by and did nothing to suggest that its own obligation to sell was conditional on or subject to some external event or specified condition. Indeed, it said to Chase that "we are selling" to Apex as well as to Conrail. The factual issues in the case turn on telephone conversations, both before and after the telex, as to which conversations conflicting evidence was heard by the trial court. The district court is entitled to disbelieve the Vanguard witness.

The whole case is a good policy argument for the application of the old hard-line statute of frauds. But the majority opinion quite correctly relies on the "merchants' exception" under N.Y.U.C.C. § 2–201(2). The only problem is that the exception merely states that the writing must be "sufficient against the sender," not "and against the party receiving it as if he had been the sender." The fact that the writing here refers only to the sender's obligation to buy and not the receiving party's obligation to sell makes the case more difficult. To be sure, the effect of the merchants' exception is to take away the defense of the statute of frauds and not to change the burden of persuasion on the issue whether a contract was made. N.Y. U.C.C. § 2–201 official comment 3. But take that defense away, it does. *See In re Marlene Industries Corp. & Carnac Textiles, Inc.*, 45 N.Y.2d 327, 331, 408 N.Y.S.2d 410, 411, 380 N.E.2d 239, 240 (1978); *Pecker Iron Works, Inc. v. Sturdy Concrete Co.*, 96 Misc.2d 998, 1003, 410 N.Y.S.2d 251, 254 (Civ.Ct.1978). And once that has been done, we are back to the telephone conversations as to which conflicting evidence was resolved in favor of Apex by the trial court.