**H/R STONE, INC., Plaintiff,**

v.

**PHOENIX BUSINESS SYSTEMS, INC., the Ultimate Corp., Ernest T. Sabato, Michael London and Grant C. Beeney, Defendants.**

No. 82 Civ. 3633 (JMW).

United States District Court, S.D. New York.

May 18, 1987.

Richard Raysman, of Brown, Raysman & Millstein, New York City, for plaintiff.

Robert M. Trien, New York City, for defendants.

## OPINION

WALKER, District Judge:

### INTRODUCTION

The instant controversy arises out of a contract under which Plaintiff H/R Stone, Inc. ("H/R Stone"), a New York corporation, purchased computer hardware and software from Defendant Phoenix Business Systems, Inc. ("Phoenix"), a New Jersey corporation. Plaintiff also has named as defendants The Ultimate Corp. ("Ultimate"), a New Jersey corporation and supplier of computer hardware and software, for whom Phoenix acted as exclusive sales agent and authorized dealer in the New York area, Michael London ("London"), the vice president and a director of Phoenix, Ernest J. Sabato ("Sabato"), the president of Phoenix and an Ultimate officer, and Grant C. Beeney ("Beeney"), the marketing manager of Phoenix.

Plaintiff alleges claims sounding in breach of contract, breach of warranty, and fraud, and seeks compensatory damages of $2,268,000, including lost profits, as well as punitive damages of not less than $1,000,-000, against Phoenix and Ultimate. Defendant Phoenix filed a counterclaim

against H/R Stone, alleging that plaintiff breached an implied covenant of good faith and fair dealing by unjustifiably refusing both to approve software specifications and to pay Phoenix all sums due under the computer contract.[1]

At the close of plaintiff's case, the Court dismissed plaintiff's fraud claims. This resulted in the elimination of Defendants Sabato, London, and Beeney from the suit, as well as any claim of punitive damages. The Court also found an insufficient nexus between any defendant conduct and the termination of plaintiff's business, and therefore eliminated that damage issue from the case. During plaintiff's direct case in this non-jury trial, the Court bifurcated the trial and concluded the trial as to liability only.

## STATEMENT OF FACTS

During the instant trial, the Court listened to the several witnesses called by each side, and carefully appraised their credibility, examined the exhibits in evidence, and heard extensive arguments by counsel. Based thereon, and after a careful post-trial review of the Court's trial notes, the Court finds the following facts.

Prior to its sale in 1981, Plaintiff H/R Stone served as an advertising representative for various radio stations, selling air time to advertising agencies and receiving a commission based on the amount of its sales. Plaintiff was organized with a central New York office and eight branch offices located at major media markets throughout the United States. In 1979, with rising competition in radio advertising, plaintiff's President, Saul Frischling

("Frischling"), decided that his company should upgrade its computer systems.

In late 1979, Frischling initiated negotiations with representatives of Defendant Ultimate, a supplier of computer hardware and software, and Defendant Phoenix, Ultimate's sales agent. These negotiations culminated in a May 9, 1980 agreement signed by representatives of H/R Stone and Phoenix. Under the agreement, Phoenix promised to furnish, within 150 days, both computer hardware and software to plaintiff. Paragraph 2 of this agreement specified that H/R Stone would pay Phoenix a total of $220,000: $160,000 for computer hardware, and an additional $60,000 for software. The agreement also stated that Phoenix would provide hardware "to cover the 8 remote locations at a cost not to exceed $8,000 per installation."

Plaintiff paid a ten percent downpayment of $22,000 when the contract was executed. On subsequent dates, plaintiff made $146,000 in additional payments to Phoenix,[2] bringing plaintiff's total payments to Phoenix to $168,000. Under the May 9 agreement, Phoenix in turn promised that "upon payment of the contract price Seller shall deliver to Buyer all source and object programs plus system and operations documentation."

The contract also provided that Phoenix would forfeit five percent of the software price if the software was not completed within 150 days of the agreement. Phoenix agreed to further penalties if the software was not completed within 210 days of the agreement. In addition, the contract specified penalties for any failure by Phoe-

---

1. During trial and in their post-trial submissions, defendants have not pursued counterclaims set forth in their pre-trial order alleging fraud and tortious interference with a business relationship between Phoenix and its software subcontractors, and seeking punitive damages and foreclosure of a security interest in computer equipment provided to plaintiff. These counterclaims are deemed abandoned.

2. Plaintiff made the following payments to Phoenix after May 9, 1980, totaling 146,000:
 1. An August 9, 1980 payment of $6,000.
 2. An October 1, 1980 payment of $20,000.
 3. An October 24, 1980 payment of $100,000.

4. A January 9, 1981 payment of $20,000.
At trial, plaintiff attempted to recharacterize the final $120,000 of these contract payments as a loan, arguing that Phoenix is now obligated to repay the "principal" ($120,000), as well as "interest" on this loan.

The Court finds that plaintiff's $100,000 October 24, 1980 payment was an advance upon which defendant agreed to pay "interest" of .041%, from October 24, 1980. To the extent that defendant is responsible for the payment of interest, such interest may be proved at the trial on damages.

nix to install the promised hardware promptly.

The contract included a clause limiting plaintiff's remedies in the case of a defendant breach:

> [I]f the Software is not in accordance with the mutually agreed upon design specification, Buyer [plaintiff] shall have the right to return the Equipment and to receive a refund on any advance made toward the Equipment Price. Furthermore, Buyer shall not be required to make any further payments of the Software Price, and all right, title, and interest in and to that portion of the Software which has been completed shall belong to Buyer.

During 1980 and 1981, Defendant Ultimate sold computer hardware and software to Phoenix, including the equipment which Phoenix in turn sold to H/R Stone. At the same time, Ultimate hired Automated Systems Design ("ASD") as a subcontractor to design computer software for use by plaintiff. Plaintiff's software purchase under the contract was divided into two categories: business software and research software. The business software purchased by plaintiff included some 85 "BASIC" programs and 99 more specialized programs. Plaintiff signed an "acceptance" of defendants' business software specifications on July 29, 1980.

In July 1980, H/R Stone approved business software specifications, and by January 1981 defendants had completed design work on the business software programs. Plaintiff formally accepted the business software on March 17, 1981, and in this action makes no complaint as to the quality of defendants' business systems. Instead, plaintiff's action arises out of dissatisfaction with defendants' development and installation of the research software systems.

During early 1980, Plaintiff H/R Stone and Defendants Phoenix and Ultimate, as well as ASD, participated in a number of meetings which focused on plaintiff's research software needs. At these meetings, plaintiff told defendants that a so-called "reach and frequency formula" formed an important part of H/R Stone's software package. A "reach and frequency formula" refers to a method for determining how many listeners will hear an advertisement broadcasted on a particular segment of a radio station's programming. A computer program allowing plaintiff to calculate a reach and frequency formula would estimate the number of listeners hearing a particular program on any station, and the appropriate rate to charge for advertising spots on that program. H/R Stone provided ASD with some information on the method used for calculating a reach and frequency formula, including a new math slide rule, a Westinghouse booklet, a hand-held calculator, and calculator cards. However, Inge Jacobson, plaintiff's research director, admitted that plaintiff did not supply ASD with all information needed for writing reach and frequency formula software programs. ASD's President Howard Marks credibly testified that he was unable to complete the reach and frequency program based on the information provided.

Under its subcontract with Ultimate, ASD was required to prepare specifications for plaintiff's research software, including plaintiff's reach and frequency formula programs. ASD's attempts to develop acceptable specifications were hindered by plaintiff's failure or delay in providing ASD with certain background information that ASD needed to develop such specifications. On October 29, 1980, ASD presented incomplete specifications to H/R Stone, which Stone rejected. By this time, ASD had spent more than $90,000 to perform its subcontract obligations. ASD thereafter phased out its work on plaintiff's programs. ASD was ultimately paid only $32,-000. Despite frequent inquiries from plaintiff, neither ASD nor any defendant or its agent ever produced complete research specifications, or any specifications for reach and frequency formula programs.

During early 1981, plaintiff's President, Frischling, received complaints from employees working in plaintiff's branch offices, who insisted that their divisions needed the research systems promised by Phoenix. On May 5, 1981, plaintiff provided

Phoenix with a letter which included a detailed list of complaints regarding Phoenix's alleged failure to perform under the contract, a statement that plaintiff viewed Phoenix as having breached the contract, and a threat that plaintiff planned to bring suit against Phoenix and "engage the services of another company to complete the portion of this project left undone by you...."

In response to the May 5 letter, Phoenix entered into further negotiations with plaintiff. These negotiations led to a supplementary letter agreement, dated July 13, 1981, under which Phoenix approved various deadlines for installation of specific hardware and software programs. Phoenix also promised to deliver to H/R Stone "immediately" the source code "for software to date" and to complete the software system, "pursuant to approved specifications," within ninety days. Using a new software supplier, Phoenix supplied plaintiff with a number of software research systems by early October 1981.

However, Phoenix never supplied plaintiff with the promised source code, without which plaintiff was unable to develop new software programs or make corrections to old ones. At trial, an ASD employee testified credibly that he knew the source code, but that defendant officers instructed him to withhold this code from plaintiff. Similarly, an employee of plaintiff credibly testified that when he asked ASD for the source code, he was told that it would not be provided until H/R Stone's difficulties with Ultimate and Phoenix were resolved.

After October 1981, plaintiff and defendants became involved in an increasingly hostile exchange of correspondence, and defendants ceased all further work on plaintiff's computer system.. At a meeting between plaintiff and defendant in October 1981, the latter's officers refused to turn over the source code, which they had in their possession, absent a settlement of the dispute. Subsequently, all attempts at negotiating a settlement failed.

Regarding the agreement to supply hardware for the eight remote locations set forth in Schedule A of the May 9, 1980

contract, Phoenix, in a letter dated August 11, 1980, described a system costing less than the $8,000 contract price. H/R Stone rejected the system, since its units required use of modems or telephone hook-ups to the main frame at the home office.

Commencing in 1981, plaintiff suffered several business setbacks, including the loss of some important clients. Two clients that left H/R Stone in 1981, radio stations KMEL in San Francisco and WYNY in New York, previously had accounted for 30 percent of plaintiff's business. However, at trial the Court heard substantial credible evidence that H/R Stone remained a relatively healthy business, despite its 1981 difficulties. Further, most of plaintiff's difficulties, such as the loss of a few valued employees and clients, bore scant relationship to plaintiff's problems with its computer system. On November 30, 1981, H/R Stone ceased doing business, other than collecting receivables. The owners of H/R Stone sold the agency contracts for $285,000 and collected outstanding receivables of slightly more than $1 million, while satisfying outstanding obligations of approximately $650,000. Thereafter, H/R Stone ceased all business activities.

On June 24, 1982, H/R Stone filed the complaint in the instant action. The Court thus makes its findings after a trial only on the liability issues, leaving relevant damages questions for later proceedings.

## DISCUSSION

### Breach of Contract

Defendant Phoenix admits that it failed to provide plaintiff both with the source code for the software supplied under the agreement, and with some of the research software sought by plaintiff, including software pertaining to the reach and frequency formula. Plaintiff asserts that these failures constituted a breach of the May 9, 1980 computer contract between H/R Stone and Phoenix, and the July 13, 1981 supplemental agreement. In addition, plaintiff asserts that defendant breached the agreement by failing to provide appro-

priate hardware for the eight remote locations.

In response to plaintiff's breach of contract argument, defendants first assert that the May 9 computer agreement did not constitute a binding contract with respect to research software. Alternatively, defendants argue that even if the May 9 agreement was a binding contract, either plaintiff's failure to cooperate in providing research specifications or plaintiff's failure to pay the full $220,000 owed under the contract amounted to a total breach of this contract, which relieved defendants of any duties under the contract. Finding neither of these arguments supported by the evidence at trial, this Court holds that the May 9 agreement was a binding contract with respect to, *inter alia,* research software and that defendants breached the contract by failing to provide the promised source code and research software.

"[I]t is rightfully well settled in the common law of contracts in this State that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109–10, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541, 543 (1981) (citations omitted); *accord Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330, 1336 (S.D.N.Y.1982); *Mitchell v. Hart,* 41 F.R.D. 138, 141 (S.D.N.Y.1966). However, even where parties explicitly designate a material term " 'to be mutually agreed upon' in the future," language absent in the instant case, courts may still find the presence of a binding agreement where "the parties intend to enter into a binding contractual relationship." *Allen & Co. v. Occidental Petroleum Corp.,* 382 F.Supp. 1052, 1057 (S.D.N.Y.1974), *aff'd,* 519 F.2d 788 (2d Cir.1975).

"[T]he existence of a contract may be established through the conduct of the parties recognizing the contract." *Apex Oil Co. v. Vanguard Oil & Service Co.,* 760 F.2d 417, 422 (2d Cir.1985); *accord Koleinimport "Rotterdam" N.V. v. Foreston Coal Export Corp.,* 283 F.Supp. 184, 186 (S.D.N.Y.1968). In determining whether the parties' conduct is consistent with the existence of a binding contract, "[i]t is necessary that the totality of all acts of the parties, their relationship and their objectives be considered." *P.J. Carlin Construction Co. v. Whiffen Electric Co.,* 66 A.D.2d 684, 684, 411 N.Y.S.2d 27, 29 (1st Dep't 1978).

■ In the instant case, the Court concludes that the parties intended, in the May 9 agreement, to enter into a binding contract with respect to research software. The May 9 agreement makes explicit reference to such software. Under Article 2 of the agreement, plaintiff agreed to pay Phoenix ten percent of the $60,000 software price upon plaintiff's acceptance of research software specifications, and an additional 15 percent of this sum upon completion of the research software. Further, the testimony describing the negotiations leading up to the May agreement established that both parties viewed the supply of research programs as an important element of defendants' obligations under the contract. On the basis of this evidence, this Court holds that the May 9 agreement represented an enforceable contract under which defendants were obligated to supply research software.

■ The only area where the Court finds that the parties did not enter a binding contract relates to the Remote Office Equipment. This becomes clear when the highly non-specific remote location computer hardware provision contained in Schedule A is compared to the detailed specifications in the body of the 1980 agreement relating to the home office equipment, and from the fact that remote hardware payments were not included in the "Equipment Price" of $160,000. While a promise to "provide hardware to cover the 8 remote locations at a cost not to exceed $8,000 per installation" with such hardware to "include a printer, a CRT device and intelligence" might, in other contexts, amount to an enforceable agreement, in the context of this agreement the Court finds that it was merely a statement of future intent subject to negotiation.

That this was the intention of the parties was born out by their subsequent conduct. Conversations followed whereby the defendant put various remote hardware options before plaintiff, offering two systems priced over $8,000 and one priced below that figure. Plaintiff rejected the latter since it required a telephone hook-up to the main office, even though it was fully consistent with the general terms of Schedule A that required simply that each remote system include "a printer, a CRT device, and intelligence (Memory)." Plaintiff at one point verbally agreed to a more expensive system, but then refused to sign agreements, taking the unreasonable position that he wanted a "stand alone" hardware system at each remote location costing no more than $8,000 that would be comparable to what plaintiff was receiving at the home office.

The resulting impasse over the remote office equipment was not resolved by the July 1981 agreement, whereby defendant agreed to provide "specifications for the remote hardware referred to in Schedule A" within ninety days. Defendant orally reproffered the lower priced system specified in the August 11, 1980 letter and plaintiff again rejected it. Based on the foregoing, the Court has no hesitation in finding that no enforceable agreement as to the remote office locations was reached. Even if Schedule A could be construed as an enforceable agreement as to the remote office equipment, Phoenix did not breach it since the equipment offer, rejected by plaintiff, would have satisfied its terms.

Defendants also contend that plaintiff's failure to agree with ASD upon detailed and complete specifications for the research software constituted a total breach of the contract, relieving defendants of all obligations under the software portion of the contract. In assessing defendants' argument, this Court begins from the proposition that typically a breach of a contractual obligation "does not nullify the contract, but rather entitles the party not in breach to recover damages." *Iligan International Corp. v. S.S. John Weyerhauser*, 372 F.Supp. 859, 870 (S.D.N.Y.1974), *aff'd sub nom., Iligan Integrated Steel Mills, Inc. v.*

*S.S. John Weyerhauser*, 507 F.2d 68 (2d Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975); *accord Zimmer v. Wells Management Corp.*, 348 F.Supp. 540, 542 (S.D.N.Y.1972).

■ This Court cannot conclude that H/R Stone's failure to approve defendants' specifications constituted a total breach, relieving defendants of all responsibilities under the contract. "It is well established that an owner has an obligation to facilitate the work of a contractor and not to do anything that would obstruct or impede the contractor's work ... but obstructions or delays are actionable only if they were not within the parties' contemplation when they made their agreement." *Niagara Mohawk Power Corp. v. Graver Tank & Manufacturing Co.*, 470 F.Supp. 1308, 1322 (N.D.N.Y.1979) (citations omitted). In *Niagara Mohawk Power*, a federal district court held that plaintiff's adoption of several changes in the design of a container for a nuclear reactor did not relieve defendant from its contractual obligations to supply plaintiff with the container, where "the making of such design changes was, in general, within the contemplation of the parties." *Id.* In the instant case, this Court similarly finds that the parties contemplated the changes in specifications requested by plaintiff. The parties' initial discussion of research specifications in relatively general terms, together with their subsequent and frequent sessions focusing on these specifications, shows that the parties expected plaintiff to modify or change some specifications before all work on the computer system was complete. The willingness of defendants to sign the July 13, 1981 agreement supports a finding that defendants did not oppose plaintiff's refinement and development of the research specifications.

■ Moreover, any lack of cooperation by plaintiff regarding the completion of research software specifications is immaterial with respect to defendants' failure to provide plaintiff with the source code, a necessary component of a complete research, as well as business, software pack-

age. Although defendants possessed the source code to plaintiff's system, which Phoenix first promised to provide under Article 8 of the May 1980 contract, and under the July 1981 supplemental agreement consented to turnover "immediately," defendants flatly refused to provide plaintiff with this code. Such defendant conduct is nothing other than a pure breach of contract, for which defendants, and not plaintiff, bear the responsibility. *See Data Probe, Inc. v. 575 Computer Services, Inc.,* 72 Misc.2d 602, 607, 340 N.Y.S.2d 56, 59 (Civ.Ct.N.Y.Co.1972).

This Court also finds that plaintiff's payment of only $168,000 of the $220,000 owed under the contract does not excuse defendants' nonperformance. As discussed in more detail below, this Court accepts Phoenix's argument that failure to pay $52,000 of the contract price constituted a breach of contract. However, the Court cannot accept Phoenix's argument that this failure to pay the $52,000 relieved defendants of all duties under the contract. During the first few months of the parties' contractual relationship, plaintiff made payments in a timely and responsible fashion. Plaintiff's delinquency in making payments began only after problems in completing the computer system became apparent. These problems resulted both from plaintiff's failure to approve defendants' specifications, and defendants' independent nonperformance of contractual obligations, such as defendants' failure to deliver the source code. Since defendants' breach of contract influenced plaintiff's decision to withhold payments, defendants may not be permitted to argue that plaintiff's refusal to make payments relieved them of all con-

tract responsibilities. *See Tri-Mar Contractors, Inc. v. Itco Drywall, Inc.,* 74 A.D.2d 601, 602, 424 N.Y.S.2d 737, 739 (2d Dep't 1980).

In sum, this Court finds that the defendants were not in breach of any agreement with respect to the remote office equipment, but that Defendants Phoenix and Ultimate [3] breached the May 1980 computer contract, as modified by the July 13, 1981 letter agreement, by failing to supply to plaintiff bargained for research software and the source code, with one exception pertaining to the reach and frequency formula, discussed below.

*Phoenix's Counter-Claim for Breach of Contract.*

At trial, Defendant Phoenix not only argued that it did not breach the contract, but also presented evidence in support of a counterclaim alleging that plaintiff breached the computer contract. Specifically, defendant argues that H/R Stone breached an "implied covenant of good faith and fair dealing" by: 1. Failing to provide defendants with the specifications needed to develop research software, and 2. Failing to pay $52,000 of the purchase price owed under the software contract.

"In every contract there is an implied covenant of good faith and fair dealing which precludes each party from engaging in conduct that will deprive the other party of benefits of the agreement." *Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980); *accord Associated Capital Services Corp. v. Fairway Private Cars,* 590 F.Supp. 10, 16 (E.D.N.Y.1982). This convenant embodies "an implicit understanding that neither party will intentionally do anything to pre-

---

**3.** Although both the May 9, 1980 and the July 13, 1981 agreements were signed on behalf of Phoenix, Ultimate is liable as well. Throughout the negotiations leading to the contract the individual defendants named in plaintiff's complaint acted on behalf of both Ultimate and Phoenix, and Phoenix was represented to plaintiff as Ultimate's sales agent. This continuing participation establishes Ultimate as a principal of Phoenix, and liable for misconduct on the part of Phoenix. *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 523 F.2d 527, 537 (2d Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785 (1976); *Riverside Research*

*Institute v. KMGA, Inc.,* 108 A.D.2d 365, 370, 489 N.Y.S.2d 220, 223–24 (1st Dep't 1985), *aff'd,* 68 N.Y.2d 689, 506 N.Y.S.2d 302, 497 N.E.2d 669 (1986).

This Court's finding of liability on the part of Ultimate also receives support from the fact that Ultimate supplied all of the computer hardware and software purchased by plaintiff under the contract. *See Hewett v. Marine Midland Bank of Southeastern New York, N.A.,* 86 A.D.2d 263, 271, 449 N.Y.S.2d 745, 751 (2d Dep't 1982) ("If the principal accepts the benefits of its agent's misdeeds, with actual or imputed knowledge, it ratifies the agent's action.").

vent the other party from carrying out his part of the agreement." *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 770 (2d Cir.1975).

■ In the instant case, this Court finds that plaintiff breached this implied covenant by failing to agree with ASD, acting for Phoenix, upon a complete set of research specifications. Plaintiff's duty to approve specifications without delay clearly was implied by the computer contract, which required that defendants either complete all software within 150 days or forfeit five percent of the software price.[4] *See Old Dutch Farms, Inc. v. Milk Drivers and Dairy Employees Union Local 584*, 222 F.Supp. 125, 130 (E.D.N.Y.1963) (explicit arbitration provision, which imposed penalty on party seeking reconsideration of dispute resolved in prior arbitration proceedings, supported court's finding that contract included implicit provision requiring parties to complete arbitration promptly).

Plaintiff engaged in a particularly flagrant breach of the implied covenant of good faith and fair dealing by failing to provide Phoenix with sufficient information to enable it to develop specifications for the reach and frequency formula. Although plaintiff's employees often had calculated this formula without computer assistance, the method used in such calculations remained a mystery to individuals, such as defendants, not intimately involved in the broadcast industry.

Despite plaintiff's familiarity with the reach and frequency formula, plaintiff did not provide it to the defendants. Plaintiff only provided Phoenix with the tools it had used to manually perform reach and frequency calculation in the past: a new math slide rule, a Westinghouse booklet, a handheld calculator, and calculator cards. These were admitted by plaintiff's own witness to be insufficient information for a layman to calculate the formula. Plaintiff thus took the bizarre position of both demanding that defendants complete soft-

ware related to the reach and frequency formula, and refusing to provide defendants with the formula itself. This Court cannot conceive of conduct more fundamentally inconsistent with the implied covenant good faith and fair dealing, and holds that this conduct went so directly to this aspect of the bargain so as to relieve defendants of their obligations to furnish a reach and frequency program. *See Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 771 (2d Cir.1975); *Rochester Park, Inc. v. City of Rochester*, 38 Misc.2d 714, 718, 238 N.Y.S.2d 822, 827 (Sup.Ct. Monroe Co. 1963), aff'd, 19 A.D.2d 776, 241 N.Y.S.2d 763 (4th Dep't 1963). This holding is limited, however, to defendants' obligations with respect to the reach and frequency program. Neither this breach by plaintiff, nor any other for which plaintiff would be liable in damages, relieved defendants of their other unperformed contractual obligations.

■ Phoenix also argues that plaintiff's failure to pay the $52,000 owed under the computer contract constituted a breach of the implied convenant of good faith and fair dealing. Case law has established that the failure to pay sums promised under a contract constitutes a breach of this implied covenant. *See, e.g., Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980); *Jamaica Savings Bank v. Lefkowitz*, 390 F.Supp. 1357, 1361–62 (E.D.N.Y.1975).

■ Plaintiff argues that its failure to pay the full contract price does not constitute a breach of contract, since defendants failed to supply all research software promised under the contract. In rejecting plaintiff's argument, this Court notes that the lack of research software resulted not only from defendants' failure to provide plaintiff with some completed software systems, such as the source code, but also from plaintiff's failure to approve specifications necessary to complete other programs. "Every contract implies that neither party will do anything to prevent performance by the other party ... and a party who vio-

---

**4.** The contract required that Phoenix forfeit another five percent of the software price if the software was not completed within 210 days from the May 9 agreement. Phoenix would forfeit a further five percent of the software price for each additional 30 day period during which the software remained incomplete.

lates this rule, which is founded on fair dealing, may not rely on such failure to excuse his own nonperformance." *Bass v. Sevits*, 78 A.D.2d 926, 927, 433 N.Y.S.2d 245, 247 (3d Dep't 1980).

Accordingly, this Court holds that plaintiff breached its implied convenant of good faith and fair dealing by: 1. Failing to provide the reach and frequency formula, thereby excusing defendants from their obligation to supply the research program related thereto; 2. Failing to approve other research specifications; and 3. Failing to pay the full amount owed under the contract.

## CONCLUSION

To summarize, the Court finds that defendants' failure to supply plaintiff with research software constitutes a breach of contract. The Court also holds that plaintiff committed a breach of contract by failing to pay Phoenix the full amount owed under the computer contract and by failing to approve research specifications. The precise amount of damages recoverable by either party must await determination after a trial thereon.

SO ORDERED.