101 F.3d 108
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
ACTION TEMPORARIES MANAGEMENT COMPANY, INC.,
Plaintiff-Appellee-Cross-Appellant,
v.
STRATMAR SYSTEMS, INC., Defendant-Appellant-Cross-Appellee.
 Nos. 95-7698(L), 95-7754(XAP).
 United States Court of Appeals, Second Circuit.
 March 12, 1996.
 
 APPEARING FOR APPELLANT:Charles A. Bradley, McCullough, Goldberger & Staudt, White Plains, NY.
 APPEARING FOR APPELLEE:Joel A. Klarreich, Klein, Heisler & Klarreich, New York, NY.
 Present: MINER, JACOBS, and CABRANES, Circuit Judges.
 
 
 1
 UPON CONSIDERATION of this appeal from a judgment of the United States District Court for the Southern District of New York, it is hereby
 
 
 2
 ORDERED, ADJUDGED, AND DECREED that the judgment be and it hereby is AFFIRMED.
 
 
 3
 This cause came on to be heard on the transcript of record and was argued by counsel.
 
 
 4
 Defendant-appellant Stratmar Systems, Inc. ("Stratmar") appeals from a judgment entered in the United States District Court for the Southern District of New York (Sprizzo, J.). Following a bench trial, the district court found that a legally enforceable agreement existed between Stratmar and plaintiff-appellee Action Temporaries Management Company, Inc. ("Action") and that Stratmar was liable to Action for services rendered by Action pursuant to the agreement in the amount of $73,509.08 plus interest and costs.
 
 
 5
 On November 8, 1993, Stratmar entered into an agreement with Thrifty Tax of America ("Thrifty") whereby Stratmar, as the exclusive agent of Thrifty, would hire, train, and supervise personnel to operate Thrifty's electronic tax filing services at retail locations across the country. Pursuant to this agreement, Thrifty agreed to reimburse Stratmar for the costs of labor incurred in staffing the Thrifty sites and to pay Stratmar a commission on each electronic tax return filed.
 
 
 6
 In November of 1993, Stratmar began to negotiate an agreement with Action, a company in the business of supplying temporary personnel services to client companies. Stratmar sought Action's services for staffing the Thrifty sites in the North Carolina region. On January 3, 1994, Action forwarded to Stratmar a proposed outline of an agreement to provide the necessary personnel services (the "proposed agreement"). The proposed agreement contained a provision requiring Stratmar to provide Action with a $25,000 deposit. Action notified Stratmar that, if it did not receive the $25,000 deposit by January 17th, Action would not provide the staffing. Stratmar advised Thrifty of Action's request for the $25,000 deposit, and Thrifty delivered a check in that amount to Action.
 
 
 7
 Throughout January of 1994, Action and Stratmar continued to negotiate. On January 25, 1994, Stratmar, in response to a second version of the proposed agreement, sought various changes, including the elimination of the provision for the $25,000 deposit. The deposit already had been forwarded to Action by Thrifty, and the provision no longer was necessary. A final draft of the proposed agreement, however, never was signed by Stratmar.
 
 
 8
 Thereafter, even without a signed agreement, Action provided temporary staff to perform services at the Thrifty sites. The cost of these services amounted to $108,518, and, in January of 1994, Action sent Stratmar two invoices requesting payment for its services. For the first invoice, Stratmar sent Action a check in the sum of $4265.50, and, on the second invoice, Stratmar sent Action a check in the sum of $10,173.51. On February 7, 1994, Stratmar informed Action that it had stopped payment on the two checks, apparently because Stratmar had learned that it would not be reimbursed by Thrifty.
 
 
 9
 On February 23, 1994, Action filed a complaint in district court seeking payment from Stratmar in the amount of $73,509.08. The district court, after a bench trial, determined that Stratmar and Action had entered into a legally enforceable agreement, and that Stratmar was liable to Action for the costs of the services provided by Action. On June 23, 1994, the district court entered judgment in favor of Action and ordered Stratmar to pay Action $73,509.08 plus interest and costs.
 
 
 10
 Stratmar contends that the district court erred in granting judgment in favor of Action. Stratmar argues that it is not liable to Action because: (1) no legally enforceable agreement existed between Stratmar and Action; and (2) even if such an agreement had existed, Stratmar was not a party to the agreement because, in negotiating the agreement, Stratmar simply was acting as an agent on behalf of its principal, Thrifty. Stratmar's contentions are without merit.
 
 
 11
 Stratmar argues that an enforceable agreement never existed because: (1) Stratmar made material changes to the proposed agreement; and (2) Stratmar never signed a final draft of the proposed agreement. Accordingly, Stratmar contends that Action, because it lacked an agreement, performed the services at its own risk. For these reasons, Stratmar claims that it should not be liable for any costs arising from Action's performance of the services.
 
 
 12
 The fact that no final contract had been signed by the parties does not necessarily mean that an enforceable agreement is non-existent. Under New York law, "the existence of a contract may be established through conduct of the parties recognizing the contract." Apex Oil Co. v. Vanguard Oil & Serv. Co., 760 F.2d 417, 422 (2d Cir.1985); see also 21 N.Y. Jur.2d Contracts § 49 (1982). Furthermore, "[i]n determining whether the parties entered into a contractual agreement ... it is necessary to look ... to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." Brown Bros. Elec. Contractors v. Beam Constr. Corp., 393 N.Y.S.2d 350, 352 (1977).
 
 
 13
 In the present case, the parties' actions demonstrated that there was an agreement between the parties. The fact that Action provided staffing for the Thrifty sites is evidence of an agreement. Likewise, the fact that Stratmar sent checks to Action as payment on the invoices demonstrates that it recognized the existence of an agreement. Although Stratmar later stopped payment on these checks, the record indicates that Stratmar stopped payment not because it believed that it was being billed for work it had not contracted for, but rather, because Stratmar learned that it would not be reimbursed by Thrifty.
 
 
 14
 Stratmar argues that, even if there was an enforceable agreement, it should not be liable to Action because Stratmar was not a party to it. Instead, Stratmar contends that, when it was negotiating the agreement with Action, it was acting as an agent for its principal, Thrifty. We reject this contention.
 
 
 15
 It is a well-settled rule of agency law that an agent of a disclosed principal will not be personally liable for a breach of contract "unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." Savoy Record Co. v. Cardinal Export Corp., 254 N.Y.S.2d 521, 523 (1964) (citation omitted). However, if the agency relationship is undisclosed, "the fact of agency will not serve as a defense in an action by a third party against the agent." Tarolli Lumber Co. v. Andreassi, 399 N.Y.S.2d 739, 740 (4th Dep't 1977). "Further, the agent will be liable even if the third party is aware that an agency relationship exists, so long as the agent fails to disclose the principal's identity." Id.
 
 
 16
 In the present case, Stratmar contends that Action was aware of the agency relationship between Stratmar and Thrifty even though Stratmar never explicitly informed Action that it was acting as Thrifty's agent. As support for its contention, Stratmar notes that Action had conversations with Thrifty prior to its negotiations with Stratmar, and that Thrifty made the $25,000 deposit payment to Action.
 
 
 17
 Apparently, Action learned of Thrifty's tax services business when an employee of Thrifty approached the president of Action and indicated that Thrifty was interested in retaining Action's services in the North Carolina region. However, Thrifty later notified Action that it had entered into a contract with Stratmar for the staffing of the Thrifty sites. Eventually, Stratmar contacted Action, and the negotiations between the parties ensued. During these negotiations, it never was revealed to Action that Stratmar was acting as an agent for Thrifty. Furthermore, the proposed agreement was devoid of any reference to an agency relationship between Stratmar and Thrifty. It provided that payment for Action's services was to be made by Stratmar.
 
 
 18
 Moreover, the record indicates that Action never believed that Stratmar was acting on anyone's behalf other than its own. The fact that Action believed that Stratmar would be the party responsible for payment under the proposed agreement is evidenced by Action's credit check on Stratmar. Finally, the fact that Thrifty paid the $25,000 deposit does not definitively demonstrate that Action knew of an agency relationship between Stratmar and Thrifty. The New York Court of Appeals has held that "[k]nowledge of the real principal is the test, and this means actual knowledge, not suspicion." Ell Dee Clothing Co. v. Marsh, 247 N.Y. 392, 397 (1928). "The mere fact that the plaintiff had reason to suppose that defendants were acting as agents will not relieve them from liability on this account." Tarolli Lumber, 399 N.Y.S.2d at 740. In the present case, although Thrifty paid the $25,000 deposit, this does not provide conclusive evidence that Stratmar was acting as Thrifty's agent.
 
 
 19
 Finally, it has not been demonstrated that any agency relationship ever existed between Thrifty and Stratmar. Instead, Stratmar's relationship to Thrifty was more like that of an independent contractor. Unlike an agent, whose acts are subject to the principal's direction and control, In re Shulman Transp. Enters., 744 F.2d 293, 295 (2d Cir.1984), an independent contractor is "one who, in exercising an independent employment, contracts to do certain work according to his own methods, and without being subject to the control of his employer, except as to the product or result of his work." Cubby, Inc. v. Compuserve Inc., 776 F.Supp. 135, 142-43 (S.D.N.Y.1991) (citation and internal quotation marks omitted).
 
 
 20
 There is no indication from the record that Stratmar was subject to the control of Thrifty in carrying out its obligations under the Thrifty-Stratmar contract. The Thrifty-Stratmar contract states that "[Stratmar] shall hire, train and supervise staff to be placed at the [Thrifty] sites. [Stratmar] shall be responsible for maintaining an adequate amount of trained staff to meet the operating needs of [Thrifty] sites during operating hours." Accordingly, because an independent contractor is liable for its own contracts, Stratmar, as an independent contractor, is liable for the cost of the services provided by Action.
 
 
 21
 We have considered Stratmar's remaining claim and find it to be without merit.