Norman **SEABROOK**, in his capacity as President of the Correction Officers' Benevolent Association; and the Correction Officers' Benevolent Association; Francis Bristol, Steven Davis, Victor DeJesus, Mario McCaskill, Deonard MaGalee, John Mercardo, Lydia Temples, and Charles Wright, Plaintiffs,

v.

Michael P. **JACOBSON**, Commissioner, New York City Department of Correction; New York City Department of Correction, Bernard Kerik, as Deputy Commissioner of the New York City Department of Correction; Elizabeth Loconsolo, as Deputy Commissioner of the New York City Department of Correction; Ernesto Marrero, as General Counsel; of the New York City Department of Correction; and the New York City Department of Correction, individually, and in their representative capacities; and the City of New York, Defendants.

No. 96 Civ.3716(SS).

United States District Court, S.D. New York.

July 7, 1997.

---

Leslie H. Ben–Zvi, Alan Serrins, Dienst & Serrins, L.L.P., New York City, for Plaintiffs.

Chlarens Orsland, Assistant Corporation Counsel, City of New York Law Department, New York City, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

SOTOMAYOR, District Judge.

The individual plaintiffs in this action are New York City Corrections Officers indefinitely suspended without pay pending the resolution of criminal charges against them. New York State's Civil Service Law § 75(3) provides that civil servants charged with incompetency or misconduct may be suspended without pay for not more than thirty days. Civil Service Law § 76(4), however, permits the City and a Union to enter into an agreement pursuant to Article 14 of the Civil Service Law supplementing, modifying or replacing Civil Service Law § 75(3). The plaintiffs allege that their Union, the Correction Officers Benevolent Association ("COBA"), has never "supplemented, modified or replaced" Civil Service Law § 75(3) by agreement between COBA and the City as authorized by Civil Service Law § 76(4). Plaintiffs seek, *inter alia,* a declaratory judgment that defendants' indefinite suspension of plaintiffs without pay under Administrative Code § 9–112, which provides for the indefinite suspension of corrections officers without pay pending resolution of criminal charges, violates Civil Service Law § 75(3) and is unauthorized by Civil Service Law § 76(4). For the reasons to be discussed, I find for the defendants, determining that COBA agreed as part of its collective bargaining contract with the City for the period 1974–1976 to the passage of New York City Administrative Code § 9–112.

### Procedural History

1. Plaintiffs commenced this action on or about May 15, 1996, asserting claims pursuant to 42 U.S.C. § 1983 and various state laws.

2. Plaintiffs also moved for a preliminary injunction directing the City to pay the correction officer plaintiffs their salaries while felony charges against them were pending.

3. By oral decision dated September 11, 1996, the Court denied plaintiffs' request for a preliminary injunction, finding that plaintiffs had failed to demonstrate either irreparable injury or a clear likelihood of success on the merits.

4. Plaintiffs subsequently withdrew all claims except the state law claim challenging Administrative Code § 9–112 on the ground that it is inconsistent with Civil Service Law § 75(3). The Court has agreed to exercise its discretion to retain jurisdiction over the pendent state law claim.

### STIPULATED FACTS

I adopt as findings the following undisputed facts agreed to by the parties in their Joint Pre–Trial Order dated June 11, 1997:

5. On October 14, 1975, plaintiff COBA and defendant The City Of New York (the "City") entered into a collective bargaining agreement.

6. On October 25, 1974, Leo Zeferetti, then–President of plaintiff COBA, appears to have signed (or authorized another to sign his name [on]) the acknowledgment portion of a letter from John Burnell, Director of the Office of Labor Relations of the defendant City of New York. Mr. Burnell's signature does not appear on the letter.

7. The text of this letter provides that said parties agree to jointly recommend language to the City Council that correction officers could be suspended without pay indefinitely rather than for thirty days pending the final disposition of departmental charges.

8. On January 7, 1976, Councilman Theodore Silverman, Chair of the Committee of Civil Service and Labor, introduced as proposed Local Law No. 33, language which was nearly identical to the language which appeared in the Zeferetti/Burnell letter.

9. As the City Council archival records and the Bill Jacket indicate, when it became clear that plaintiff COBA would not support said proposed local law, plaintiff COBA, defendant City of New York and representa-

tives of the Mayor's office lobbied the New York City Council and worked with various members of the City Council over the course of the next five (5) months until various changes had been made to the language initially proposed by Councilman Silverman.

10. Said modifications having been made to Councilman Silverman's proposed local law, both plaintiff COBA and defendant City of New York thereafter supported the amended version of Councilman Silverman's original language. This new version of the local law was passed by the City Council on July 6, 1976 and became Administrative Code § 9–112.

### ADDITIONAL FINDINGS OF FACT

Based on the testimony presented and the exhibits admitted during the bench trial of June 16, 1997, my additional factual findings pursuant to FED.R.CIV.P.52 are as follows:

### The Parties And The Claims

11. The Correction Officers' Benevolent Association ("COBA") is the duly authorized collective bargaining representative of correction officers employed by the New York City Department of Correction ("DOC") and the City of New York.

12. Plaintiff Norman Seabrook is the current president of COBA. He has been a member of COBA since 1988.

13. Leo Zeferetti was the president of COBA in the period June 1968 to November 1974. Mr. Zeferetti currently lives in Florida and the parties submitted transcripts of his two depositions as part of the trial evidence.

14. Following Mr. Zeferetti's election to Congress in November 1974, Harold Brown, Mr. Zeferetti's Vice-President, became President of COBA for a period of approximately three to four years. Mr. Brown is deceased.

15. Mr. Brown's Vice-President, Donald Cranston, succeeded Mr. Brown as President of COBA. The parties also submitted Donald Cranston's deposition as part of the trial evidence.

16. Frank Prial was the General Counsel for COBA during the tenure of Messrs. Zeferetti and Brown. Mr. Prial is currently in ill health and was not available to the parties.

17. Benjamin J. Malcolm was the Commissioner of DOC in the early to mid–1970's. Mr. Malcolm is also deceased.

18. The following individual plaintiffs are current or former correction officers who were suspended without pay following their arrests for various felonies: [1]

a. Francis Bristol: arrested and charged with theft of services on January 24, 1996. He was suspended the same day. Mr. Bristol is charged with making $26,000 worth of phone calls to Guyana while working at a Rikers Island Correctional Facility.

b. Steven Davis: arrested and charged with conspiracy in the first degree, criminal possession of a controlled substance in the second and third degrees, and endangering the welfare of a child. He was arrested on February 24, 1996, and suspended that same day. Mr. Davis, along with two associates—one of whom was a 15 year old minor—is charged with the purchase of crack cocaine. At the time of the purchase, Mr. Davis allegedly was wearing a bullet proof vest and carrying a firearm.

c. Victor DeJesus: arrested for a physical assault on an inmate on September 19, 1995. He was suspended the same day.

d. Mario McCaskill: arrested and charged with murder in the second degree for an off–duty shooting on December 31, 1995. He was suspended the same day. Officer McCaskill was subsequently acquitted and is awaiting a DOC administrative trial.

e. Denard MaGalee: arrested and charged with criminal possession of stolen property in the third degree;

f. John Mercado: arrested and charged with two counts of sexual abuse and

---

1. In the Defendants' Proposed Findings of Fact and Conclusions of Law, at 5, n. 2, defendants represent to the court that plaintiffs' counsel agreed to stipulate to the arrest and suspension information concerning the individual plaintiffs.

one count of endangering the welfare of a minor. He was arrested on January 12, 1996, and was suspended the same day. He pled guilty to a misdemeanor and was granted a disability retirement on June 4, 1996.

g. Lydia Temples: arrested and charged with tampering with public records in the first degree. She was arrested and suspended on December 4, 1995.

h. Charles Wright: arrested and charged with reckless endangerment in the first degree. He was arrested on March 4, 1994, and suspended that same day. Mr. Wright was arrested with eight vials of crack cocaine and two glassine envelopes of cocaine. He resigned on March 9, 1994.

### The Pertinent Statutes

19. This lawsuit challenges the validity of Local Law No. 33, codified as New York City Administrative Code § 9–112, and signed into law by then-Mayor Abraham Beame on July 2, 1976.

20. Local Law No. 33 provides as follows:

### A LOCAL LAW

To amend the administrative code of the city of New York, in relation to suspension and resignation of members of the uniformed force of the department of correction.

*Be it enacted by the Council as follows:*

Section 1. Title A of chapter twenty-five of the administrative code of the city of New York is hereby amended by adding thereto two new sections, to be sections 623(4)–3.1 and 623(4)–3.2, to read, respectively, as follows:

§ 623(4)–3.1. Suspension of members of the uniformed force.—Where a member of the uniformed force shall be charged with the commission of a crime, he may be suspended without pay for the duration of the time that said criminal charges are pending final disposition. If the member is found not guilty of such criminal charges he shall be paid full back pay for the period of suspension. However, after the final disposition of said criminal charges no member of the uniformed force shall be suspended without pay for more than thirty days while awaiting disposition of departmental charges against him. If the member is found not guilty of the departmental charges he shall be paid full back pay for the period he had been suspended while awaiting disposition of the departmental charges against him. In the event an award of back pay is made pursuant to this section, the amount of any salary or income earned by the member of the uniformed force during the period of suspension shall be deducted from the award.

§ 623(4)–3.2. Resignation by members of the uniformed force.—Absence, without leave and without an explanation, of any member of the force for five consecutive work days, shall be deemed and held to be a resignation, and the member so absent shall, at the expiration of such period, cease to be a member of the force and be dismissed therefrom.

§ 2. This local law shall take effect thirty days after its enactment.

21. New York State Civil Service Law § 75(3) provides, in pertinent part, as follows:

### § 75. Removal and other disciplinary action

\*    \*    \*    \*    \*    \*

3. Suspension pending determination of charges; penalties. Pending the hearing and determination of charges of incompetency or misconduct, the officer or employee against whom such charges have been preferred may be suspended without pay for a period not exceeding thirty days.

22. Civil Service Law § 76(4) provides, in pertinent part, as follows:

4. Nothing contained in section seventy-five or seventy-six of this chapter shall be construed to repeal or modify any general, special or local laws or charter provision relating to the removal or suspension of officers or employees in the competitive class of the civil service of the state or any civil division. *Such sections may be supplemented, modified or replaced by agree-*

*ments negotiated between the state and an employee organization pursuant to article fourteen of this chapter.* (emphasis added).

23. Civil Service Law Article 14, § 201, paragraph 12, defines an agreement as follows:

12. The term "agreement" means the result of the exchange of mutual promises between the chief executive officer of a public employer and an employee organization which becomes a binding contract, for the period set forth therein, except as to any provisions therein which require approval by a legislative body, and as to those provisions, shall become binding when the appropriate legislative body gives its approval.

24. The New York City Collective Bargaining Law is codified in Administrative Code § 12–301, *et seq.*

25. Administrative Code § 12–306 requires, *inter alia*, the following:

c. Good faith bargaining. The duty of a public employer and certified or designated employee organization to bargain collectively in good faith shall include the obligation:

\*    \*    \*    \*    \*    \*

(5) if an agreement is reached, to execute upon request a written document embodying the agreed terms, and to take such steps as are necessary to implement the agreement.

26. The issue before this Court is whether COBA's endorsement of the passage of Administrative Code § 9–112 was a product of COBA's collective bargaining agreement with the City for the period 1974 to 1976 or a product of legislative lobbying coercion upon COBA. The difficulty with this case has been that the parties have been unable to secure direct testimony concerning the 1974–1976 COBA contract with the City because of the memory failure of the main negotiator, Leo

Zeferetti, the deaths of Harold Brown, John Burnell and Benjamin Malcolm, and the illness of Frank Prial. Moreover, the Union alleges that a former President of COBA has taken and destroyed the Union's records of the pertinent time. Accordingly, the parties and the Court have had to rely largely upon the documentary evidence in the possession of the City and reasonable inferences from the practices of the parties.

### COBA's Collective Bargaining Process with the City in the early 1970s

27. During Leo Zeferetti's tenure as President of COBA, he and Frank Prial negotiated COBA's contracts with the City's Office of Labor Relations. (Zef. I at 13–14.) [2]

28. Once a tentative agreement for a collective bargaining contract was reached, COBA's negotiation team would present the terms of the agreement to the Union's Executive Board and to Union delegates. After the Board and delegates approved the terms of the agreement, those terms were circulated to the membership in summary form and subjected to a membership vote for ratification. Only after the membership ratified the summary terms of a new agreement would a formal contract be prepared with the City and signed by the COBA leadership. (Zef. I at 37–38; Zef. II at 11–12.)

29. Donald Cranston, Vice–President of COBA under Harold Brown, recalls that agreement on the 1974–1976 COBA contract with the City was settled by Leo Zeferetti and Harold Brown in 1974 but that the formal contract was not signed until 1975. (Cranston at 6.) Historically, once the parties agreed upon terms, the City often would implement some of the terms of the agreement well before the parties signed a formal contract. (Hanley Aff. ¶ 12.) [3]

30. Donald Cranston's memory that the terms of the 1974–1976 contract were reached in 1974 is confirmed by the fact that

**2.** The parties stipulated to the use of the depositions of Leo Zeferetti and Donald Cranston at trial. "Zef. I at ——" refers to the pages of the transcript of Leo Zeferetti's deposition held on February 27, 1997. "Zef. II at ——" refers to the pages of the transcript of Leo Zeferetti's second deposition held on June 4, 1997. "Cranston at

——" refers to the pages of the transcript of Donald Cranston held on June 11, 1997.

**3.** The parties submitted the direct testimony of trial witnesses by affidavit. "Aff. ¶ ——" refers to the paragraph in the named witness's trial affidavit.

on or about August 1, 1974, a letter to the membership of the Union was circulated under the signature of Leo Zeferetti. The opening paragraph of this August 1, 1974 letter advised the membership that: "The following contract agreement was negotiated by your Executive Board with the City of New York, and your Executive Board unanimously recommends it to the membership for approval [sic]: . . ." (Plaintiffs' Trial Ex. 11.)

31. The final paragraph of the August 1, 1974 letter further told the membership that: "At a Delegate's Meeting held on July 31, 1974, a motion was made and unanimously passed recommending approval of the contract." (*Id.*)

32. Mr. Zeferetti has identified the August 1, 1974 letter as the type of letter sent to the Union's membership before a vote was taken ratifying the terms of an agreement with the City. (Zef. II at 6–7.)

33. Although COBA has no records indicating that the membership ratified the terms of the agreement set forth in the August 1, 1974 letter, the Court concludes it did for two reasons. First, the salary increases and retirement benefits described in the August 1, 1974 letter were identical to the salary increases and retirement benefits included in the formal collective bargaining agreement signed by COBA and the City on October 14, 1975. (*Compare* the August 1, 1974 letter, Plaintiffs' Trial Ex. 11, with the October 14, 1975 Contract, Plaintiffs' Trial Ex. 2.)

34. Second, the August 1, 1974 letter in its last section, under the heading "Parity Guarantee," contained terms agreeing to the indefinite suspension of corrections officers pending resolution of criminal charges. Leo Zeferetti signed a letter on October 25, 1974, agreeing to recommend legislation with these terms to the City Council.

35. The August 1, 1974 letter to the Union membership described the following agreement with the City, in the section captioned "Parity Guarantee":

Consistent with provisions now applied to the members of the New York City Police Department the following procedures will be applied for the Corrections Department.

A Corrections Officer who is absent without leave (AWOL) five (5) consecutive days without explanation shall be deemed as having resigned from the Department.

A Corrections Officer charged with a crime may be suspended without pay until thirty (30) days following final disposition of such criminal charge, with a provision that all monies be returned from date of suspension if acquitted of the criminal charge.

(Plaintiffs' Trial Ex. 11.)

36. The text of the October 25, 1974 letter signed by Leo Zeferetti, then–President of plaintiff COBA, and described in paragraphs 6 and 7 *supra*, addresses directly the two parity issues set forth in the August 1, 1974 letter to the union membership.

37. The text of the October 25, 1974 letter, sent under Burnell's letterhead and signed by Leo Zeferetti, states:

Dear Mr. Zeferetti:

*During our recently concluded labor negotiations the parties agreed to jointly recommend to the City Council of New York the adoption of the following legislation: To amend the administrative code of the City of New York in relation to suspension and resignation of members of the Uniformed Force of the Department of Correction.*

Be it enacted by the Council as follows:

Section 1, Chapter 25 of the administrative code of the City of New York is hereby amended by adding thereto two new sections, to be sections 626–1.0 and 626–2.0, to follow section 625–3.0, to read as follows: 626–1.0. Suspension of members of the uniformed force.

Where a member of the uniformed force shall be charged with the commission of a crime he may be suspended without pay for the duration of the time that said criminal charges are pending final disposition. However after the final disposition of said criminal charges no member of the uniformed force shall be suspended without pay for more than 30 days while awaiting disposition of departmental charges against him. If the member is found not guilty of the charges, he shall be paid full back pay.

626–2.0. Resignation by members of the uniformed force.

Absence, without leave and without an explanation of any member of the force for five consecutive work days shall be deemed and held to be a resignation, and the member so absent shall, at the expiration of such period cease to be a member of the force and be dismissed therefrom without notice.

This local law shall take effect thirty days after its enactment.

(Plaintiffs' Trial Ex. 1) (emphasis added).

38. In the 1970s, it was a goal of COBA to achieve parity with the New York City Police Department in contractual matters. (*See* Zef. II at 9–10; Hanley Aff. ¶ 7.) During Mr. Zeferetti's tenure, COBA "always obtained" parity with other uniformed services. (Zef. II at 9–10.)

39. At the time of Zeferetti's tenure, police officers charged with crimes could be suspended without pay pending resolution of the criminal charges, under then Administrative Code § 434a–20–0. (*See Baker v. Cawley*, 459 F.Supp. 1301 (S.D.N.Y.1978), aff'd, 607 F.2d 994 (1979).) This provision of the Administrative Code was subsequently modified by Civil Service § 75(3–a), which limited unpaid suspensions to 30 days for police officers, but not other uniformed officers.

40. Since negotiating the 1974–1976 contract, COBA has raised various demands with the City on disciplinary matters, objecting, for instance, to the suspension of officers without pay until criminal charges are resolved. The City has never agreed to this COBA demand. (*See* Hanley Aff. ¶ 17.)

41. Not until this action had COBA ever raised the argument that Administrative Code § 9–112 violated Civil Service Law § 75(3).

42. The Court concludes that the October 25, 1974 letter bearing Zeferetti's signature confirms that COBA agreed as part of its collective bargaining contract for 1974–1976 to permit the City Council to replace Civil Service Law § 75(3) with an Administrative

Code provision providing for the indefinite suspension of corrections officers pending the resolution of criminal actions. The legislative history of Local Law No. 33, later Administrative Code § 9–112, further confirms that COBA endorsed Administrative Code § 9–112 as part of the obligations it undertook in its collective bargaining agreement with the City for the 1974–1976 contract.

### The Legislative History of Local Law No. 33

43. By letter dated January 14, 1975, William Ritholtz, Director of Legal Affairs of the Department of Corrections, sent to Martha Holstein, the City's Legislative Representative, a proposed amendment to the Administrative Code permitting the suspension of uniformed officers without pay pending the disposition of criminal and departmental charges. The Ritholtz letter directly referenced COBA's endorsement of the legislation pursuant to Zeferetti's signed agreement in the October 25, 1974 Burnell letter:

> Pursuant to telephone conversation I had with you on January 14, 1975, I am herewith enclosing a copy of the proposed amendment to the Administrative Code.
>
> *    *    *    *    *    *
>
> I am also enclosing a letter from John T. Burnell, Director, Office of Labor Relations City of New York to Mr. Leo Zeferetti, President, Corrections Officers' Benevolent Association, in which the Correction Officers' Benevolent Association [sic] agreed with the Department of Correction to jointly recommend to the City Council the adoption of the enclosed legislation.

(Plaintiffs' Trial Ex. 12.) [4]

44. The record does not disclose what occurred in the subsequent eleven months but by letter dated December 18, 1975, DOC Commissioner Benjamin J. Malcolm requested the assistance of Thomas J. Cuite, Vice–Chairman & Majority Leader of the City Council, in amending the City's Administrative Code to permit the suspension of cor-

---

4. The parties did not bate stamp multiple pages in an exhibit. Accordingly, the Court can only reference the full exhibit and not the exact location of a specified letter, report, or memorandum within the exhibit.

rections officers without pay pending the resolution of criminal charges. Malcolm's proposed legislation was identical to the proposed legislation described in the October 14, 1974 letter signed by Leo Zeferetti. Malcolm's letter also directly referenced COBA's agreement to the proposed legislation: "I am enclosing our application to ammend [sic] the Administrative Code as indicated. *This change was agreed to by the Corrections Officers Benevolent Association in their negotiations with the City.*" (Plaintiffs' Trial Ex. 12) (emphasis added).

45. On January 7, 1976, Councilman Theodore Silverman, Chair of the Committee of Civil Service and Labor, introduced as proposed Local Law No. 902 (later to become Local Law No. 33), a bill whose language was nearly identical to the language which appeared in the Burnell letter of October 25, 1974, which Zeferetti had signed. (Plaintiffs' Trial Ex. 12.)

46. Thereafter, COBA objected to the first draft of the legislation because it could be construed to require an officer to be acquitted at both the criminal trial and a subsequent DOC disciplinary hearing before receiving back pay for his or her suspension. (*See* Daly Aff. ¶¶ 25–30).

47. Under the auspices of Councilman Silverman, Chairman of the City Council Civil Service and Labor Committee, the bill was redrafted to address COBA's concern. On February 17, 1976, Councilman Silverman recommended to William Ritholtz an amendment to Ritholtz's original proposed legislation. The amendment required corrections officers to be paid full back pay for their period of suspension if a finding of not guilty was made on the criminal charges pending against an officer. Officers were also to be paid for the period of suspension while awaiting disposition of departmental charges if they were found not guilty of those charges. This language was not a part of the October 25, 1974 letter signed by Zeferetti. (Daly Aff. ¶¶ 22–23.)

48. The minutes of the Committee meeting held on April 26 and 27, 1976 notes COBA's endorsement of the amended bill as follows:

Frank Prial (Counsel), Harold Brown (President), and Donald Cranston (Vice–President) of the Corrections Officers Benevolent Association testified next on the bill. They supported the amended version of the bill, which provides that when the employee is found not guilty of criminal charges he will receive his back pay regardless of the departmental hearing findings. They stated that using the Police Department procedures in this area as a model was a poor practice since those regulations are out-dated.

The bill was laid over pending a meeting between Council staff, us, the Union and the Comm. of Corrections. (A brief meeting was held following the hearing where it was agreed we would support the amended bill.)

(Plaintiffs' Trial Ex. 13.)

49. On May 27, 1976, at a New York City Council Civil Service and Labor Committee Meeting, Councilman Leon Katz proposed another amendment to Local Law No. 33 requiring that a corrections officer's back pay payment be reduced by amounts earned at other jobs during a suspension. (Daly Aff. ¶ 40.)

50. The minutes of the City Council Civil Service and Labor Committee meeting held on May 27, 1976, reflect COBA's endorsement of the total of Local Law No. 33 as follows:

An Administration bill, Introductory Number 902, will allow the Corrections Department to suspend, without pay, a Corrections Officer for the duration of time that criminal charges against him are pending final disposition. On April 11, the Corrections Officers' Benevolent Association (Harold Brown and Frank Prial) proposed amendments which would allow a Corrections Officer, if he is found innocent of criminal charges, to collect his back pay from the entire time of his suspension. On April 11th, Introductory Number 902 was laid over to allow Malcolm, Brown, and Prial to consult with Ted Silverman and us on whether to accept the C.O.B.A. amendments. After the meeting, we all met and decided that the C.O.B.A. amendments were equitable.

Today, Leon Katz proposed an additional amendment, which was accepted, that a suspended Correction Officer who takes a part–time or outside job pending final disposition of his charges, should have that amount he earned deducted from back pay awarded to such Officer if he is found innocent. (This procedure, although not legislatively codified, is presently in effect by case law.)

The amendments having been approved by Ben Malcolm, Harold Brown, Frank Prial, the Committee, and us, Introductory Number 902–A was passed by 8 affirmative votes.

51. A City Council Committee on Civil Service and Labor Law Report on Local Law No. 33, issued on June 22, 1976, makes very clear that Local Law No. 33 was a direct product of the collective bargaining agreement between COBA and the City. Specifically, the Report states as follows:

Included in our file is a copy of a letter from John T. Burnell, Director of the Office of Labor Relations to Mr. Leo Zefferetti [sic], President of the Corrections Officers Benevolent Association, dated October 25, 1974, wherein Mr. Burnell states that this legislation was agreed to by the parties during labor negotiations and that they jointly agreed to recommend it to the City Council.

(Plaintiffs' Trial Ex. 12.)

52. Ultimately, the City Council passed Local Law No. 33. In his public signing statement on July 2, 1976, Mayor Beame acknowledged "the cooperation and support of the Correction Officers' Benevolent Association under the leadership of Harold Brown and the Association's Counsel, Frank Prial." (See Daly Aff. ¶ 41.)

53. Plaintiffs maintain that the lobbying effort before the City Council by COBA demonstrates that the Union and the City had never reached a meeting of the minds in their collective bargaining agreement. Plaintiffs view COBA's endorsement of Administrative Code § 9–112 simply as COBA's suc-

cumbing to legislative pressure to accept the deal and not a part of the collective bargaining agreement it had reached with the City to modify Civil Service § 75(3). I disagree.

54. Both Leo Zeferetti and the Union's other witness, Robert Daly, a former Associate Council and Director of DOC's Legal Division, testified that it was not uncommon for COBA and the City to reach agreement in their collective bargaining negotiations on legislative proposals. (Zef. II 22.)[5] According to Robert Daly, such agreement would only be memorialized by a side letter to the formal collective bargaining agreement, but the side letter would only reference the agreement to recommend legislation. The side letter, according to Mr. Daly, would never include actual language for the legislation. Only after the side letter was executed would the parties negotiate the proposed legislation for submission to the City Council. In fact, the 1974–1976 contract between COBA and the City contains a February 6, 1973 letter, signed by both sides, in which "COBA and the City agreed to prepare, submit and support necessary legislation to permit the Department to schedule standard tours of duty in excess of eight hours in order to permit the Department to implement new work charts." (Plaintiffs' Trial Ex. 2.). This agreement was entered into almost two years before the formal contract was signed.

55. Leo Zeferetti has admitted that COBA clearly understood that agreed upon proposed legislation with the City could be changed during the legislative process. (Zef. II at 21–22.) The issue, to Leo Zeferetti, was whether the final bill was within the concept agreed to by the parties and whether the Union approved of the language used in the final bill. (Zef. II at 22–23.) The plaintiffs now argue that the Union membership had to ratify the actual language of a final bill before it became a part of the collective bargaining agreement between the parties. The record belies this claim. Nowhere in any of the contracts between the City and COBA is there any type of document indicat-

---

**5.** The testimony of Robert Daly described in this paragraph occurred at trial. The parties have not made the transcript of the trial available to the Court. Therefore, the Court cannot reference the pages of the trial transcript.

ing or demonstrating that the union membership ever ratified the actual language found in a bill. The collective bargaining contracts only have the type of side letters described by Mr. Daly which referenced COBA's agreement to propose legislation, not its actual language. Even in Mr. Daly description of the process, the City and Union officers, not the union membership, negotiated and approved the actual terms of proposed legislation. In fact, plaintiff Seabrook testified at trial that since 1988, when he became a member of the Union, members were never presented with actual contract language but only with terms of an agreement similar to the August 1, 1974 letter. Hence, there is no reason why the union's approval of a City Council change in agreed upon proposed legislation could not be made by way of endorsement of City Council legislation. The October 25, 1974 letter signed by Zeferetti followed by the legislative history of Local Law No. 33 confirms that the Union in their collective bargaining agreement with the City in 1974, agreed to the terms of Administrative Code Law § 9–112 as a replacement of Civil Service Law § 75(3). I find that the Union's endorsement of the passage of Administrative Code § 9–112 was the result and product of the collective bargaining contract between the parties, and not a result of political pressure.

### CONCLUSIONS OF LAW

56. As a result of its exercise of its supplemental jurisdiction, the Court determines that it has subject matter jurisdiction over plaintiffs claims by virtue of 28 U.S.C. § 1367. Venue is proper in this district under 28 U.S.C. § 1391(b), as the judicial district in which the acts giving rise to plaintiffs' claims were committed.

57. I adopt herein any Finding of Fact previously set forth which might more properly be deemed a Conclusion of Law.

58. Plaintiffs allege that Administrative Code § 9–112 violates the provisions of Civil Service Law § 75(3), which requires that tenured civil servants be paid their salaries if a hearing is not held within 30 days of their suspension. Defendants maintain that Administrative Code § 9–112 fits within two exemptions to Civil Service Law § 75(3) contained in Civil Service Law § 76(4). Defendants have the burden of proving that the exemptions in Civil Service Law § 76(4) apply to Administrative Code § 9–112. *United States v. First City National Bank of Houston,* 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) (the general rule is that one claiming the benefit of an exception to the prohibition of a statute has the burden of proof ); *Federal Trade Commission v. Morton Salt Co.,* 334 U.S. 37, 44–45, 68 S.Ct. 822, 827, 92 L.Ed. 1196 (1948) ("[T]he general rule of statutory construction [is] that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on the one who claims its benefits . . .")

59. The first exemption of Civil Service Law § 76(4) provides that:

Nothing contained in section seventy–five or seventy–six of this chapter shall be construed to repeal or modify any general, special or local laws or charter provision relating to the removal or suspension of officers or employees in the competitive class of the civil service of the state or any civil division.

60. At the preliminary injunction hearing of September 11, 1996, this Court found that this provision, by its express reference to the "repeal or modification" of local laws, could only be reasonably construed to be a grandfather savings clause, permitting only preexisting local laws to continue in existence. (Sept. 11, 1996 Tr. at 11–12). The Court adopts its earlier reasoning and concludes that because Administrative Code § 9–112 was passed after the enactment of Section 75(3), it does not fit within the grandfather savings clause of § 75(4). *Meringolo v. Jacobson,* No. 122408/96, slip op. at 5, —— Misc.2d ——, —— N.Y.S.2d ——, —— [1997 WL 523286] (N.Y. Sup.Ct. June 17, 1997) ("the language of § 76(4) is clear as it stands, that the exemption applies to laws in existence when § 76(4) was passed.")

61. The second statutory exemption in Civil Service Law § 76(4) provides as follows: "Such sections may be supplemented, modified or replaced by agreements negotiated

between the state and an employee organization pursuant to article fourteen of this chapter."

■ 62. Although no records exist (because of the destruction of Union records by a former president) establishing that the union membership ratified the express language of Administrative Code § 9–112, for the reasons discussed in paragraphs 32–34, 54 and 55, I found that the Union membership, by ratifying the terms of the agreement with the City contained in the August 1, 1974 letter of Zeferetti to the members, authorized its officers to negotiate and approve, on its behalf, Administrative Code § 9–112. *See Ballentine v. Koch,* 89 N.Y.2d 51, 58, 651 N.Y.S.2d 362, 365–66, 674 N.E.2d 292, 295–96 (N.Y.1996) (holding that the Police Benevolent Association, which had agreed to recommend to the state legislature a bill creating a separate benefit fund, was bound by version of law negotiated and passed during legislative process. The Court also held that PBA officers were "acting outside the scope of its representational authority in agreeing to the statutory provisions at issue ... [P]laintiffs designated the PBA as their agent for the collective bargaining negotiations at issue here and were thus bound by its actions taken on their behalf during the negotiation process ..." ) (citations omitted).

■ 63. For the reasons discussed in paragraph 55, *supra,* the Court further concludes that COBA endorsed passage of Administrative Code § 9–112 as a result and product of its agreement to do so in its collective bargaining contract with the City for the period 1974–1976. Thus, Administrative Code § 9–112, as applied to correction officers, constitutes an "agreement negotiated between the state and an employee organization," and is consistent with the statutory exemption of Civil Service Law § 76(4).

■ 64. I reject plaintiffs' contention that the COBA leadership, including Harold Brown, merely endorsed passage of the amended Administrative Code § 9–112 as damage control for legislation that the City Council intended to pass with or without COBA's support. The legislative history previously described in paragraphs 43–53

makes it clear that COBA had committed itself to a harsher form of Administrative Code § 9–112 and that Harold Brown merely ameliorated the consequences of his predecessor's commitment. Donald Cranston has clearly explained what occurred:

Q. Do you recall whether or not Harold Brown, at any time, submitted any side letters to be attached to any collective bargaining agreements concerning the suspension issue?

A. No, I don't believe Harold ever submitted any side letter.

Q. Would it be fair to say that he didn't do so because he was not in favor of the original suspension language as Leo Zeferetti had phrased it?

\*   \*   \*   \*   \*   \*

A. I don't believe Harold [Brown, Vice-President under Leo Zeferetti and then President of COBA] supported the bill. Let's say in his heart he didn't support the bill in any form. But he compromised that he would support it, but that he was against it.

Q. When you say "was against it" in his capacity as president of COBA he was against it?

A. *When he came into a position of having the authority as a vice-president, he had to support the bargaining issues. But when he became president, he was in a position to try to change it, he tried.*

(Cranston at 17) (emphasis added). Harold Brown's change of mind did not rescind the Union's agreement. It merely put pressure on the City to accept the modification in the bill or delay passage of the legislation while the parties' contractual commitments were disputed.

■ COBA's failure to challenge the legality of Administrative Code § 9–112 for approximately 20 years confirms that the Union understood that it had committed itself to Administrative Code amendment in its contract with the City. Under New York contract law, the existence of a contract may be established through conduct of the parties recognizing the contract. *Apex Oil Co. v.*

*Vanguard Oil & Service Co. Inc.*, 760 F.2d 417, 422 (2d Cir.1985) (citing *P.J. Carlin Construction Co. v. Whiffen Electric Co.*, 66 A.D.2d 684, 411 N.Y.S.2d 27 (1st Dep't 1978).) COBA has acknowledged the validity of Administrative Code § 9–112 by raising various demands on disciplinary matters, including suspension, in the context of collective bargaining negotiations with the City. By waiting until 1996 to challenge the DOC suspensions policy in court, COBA has effectively conceded that the Administrative Code § 9–112 was negotiated and accepted by it as part of its collective bargaining process with the City.

### Plaintiffs' Other Arguments

67. Plaintiffs also maintain that COBA and the Union did not intend to be bound by the October 25, 1974 Burnell letter both because Burnell's signature is missing from the letter and because the letter was not a part of the official contract number–stamped by the City. In fact, the Burnell letter was found by the City in an Office of Labor Relations folder, and was not a part of the officially registered contract. Because Burnell is dead and Leo Zeferetti has no memory of the October 25, 1974 letter, it is impossible to know why the letter was not placed in the official number–stamped copy of the 1974–1976 Collective Bargaining Agreement between COBA and the City. However, the official registered contract, Plaintiffs' Trial Ex. 2, shows that another side letter to the agreement, the February 6, 1973 letter from Commissioner Malcom to Leo Zeferetti described in paragraph 54, *supra*, was originally stamped with a different contract number, 73045, which was at some undisclosed time crossed–out and a correct contract number added. This fact demonstrates that some filing and stamping difficulties, for unexplained reasons, affected this contract. At least one other COBA official contract with the City, Plaintiffs' Trial Ex. 10, also contains side letter agreements that are not stamped with the contract number. In short, the Court rejects plaintiffs' argument that the failure to stamp the October 14, 1975 letter demonstrates that the parties did not agree to its terms, particularly in light of the repeated references in the legislative history to the October 25, 1974 letter.

68. The Court also notes that the collective bargaining contract between the City and COBA commonly have counterpart signature pages. Given the filing difficulties with this contract, the Court draws no negative inference from the City's failure to have Burnell's signature on the October 25, 1974 letter.

69. Plaintiffs also argue that the Court in *Meringolo v. Jacobson*, No. 122408/96, slip op. at 5, —— Misc.2d ——, —— N.Y.S.2d ——, —— (N.Y. Sup.Ct. June 17, 1997) has invalidated Administrative Code § 9–112 under Civil Service Law § 75(3). I disagree. In the *Meringolo* case, only the Correction Captains Association challenged the validity of Administrative Code § 9–112. The *Meringolo* Court rejected plaintiffs attempt to intervene in the action. The *Meringolo* Court did not address the issue of whether COBA had collectively bargained for the passage of Administrative Code § 9–112. All the *Meringolo*, Court concluded was that the information in the bill jacket for Local Law No. 33 was insufficient to convert COBA's support for the bill into a collective bargaining agreement. *Id.* at 6, —— N.Y.S.2d at ——. In fact, for this proposition, the *Meringolo* Court cited this Court's similar decision at the preliminary injunction hearing that the bill jacket alone was not enough to demonstrate the existence of a collective bargaining agreement. *Id.*; September 11, 1996 Tr. at 12–13. Moreover, the *Meringolo* court alternatively held that a decision that COBA had negotiated an agreement with the City would not bind the plaintiffs before it, the Correction Captains' Association:

> When the Mayor signed the bill [Administrative Code § 9–112], he commended Commissioner Malcolm and "acknowledg[ed] the cooperation and support of the Correction Officers' Benevolent Association ..." Whatever the nature of the 'support of the Correction Officers' Association, given the political context of the situation, the passage of a charter provision does not constitute a negotiated agreement between the City and a union (see *Robinson v. New York City Transit Authority,*

226 A.D.2d 467 [641 N.Y.S.2d 55 (2d Dept. 1996)]; cf. *Seabrook v. Jacobson,* 96 Civ. 3716 [970 F.Supp. 252 (S.D.N.Y.1997)] (Sotomay[o]r, J.)). Even if the "support" of the Correction Officers' Association were held to constitute a negotiated agreement with DOC, it would not be binding on the petitioner here, the Correction Captain's Association.

*Meringolo* at 6, —— N.Y.S.2d at ——. In short and contrary to plaintiffs contention, the holding in *Meringolo* does not invalidate in any way this Court determination, now based upon a full record and trial, that Administrative Code § 9–112 as it applies to COBA is valid.

### CONCLUSION

For the foregoing reasons, I find that defendants have met their burden of demonstrating that the statutory exception of Civil Service § 76(4) applies COBA under Administrative Code § 9–112 and I direct the Clerk of the Court to enter judgment in favor of the defendants dismissing the complaint against them.

**SO ORDERED.**